IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Sherry P. Phillips, | ) | C/A No.: 1:14-1236-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)(1) (D.S.C.), and the order of the Honorable Joseph F. Anderson, Jr., dated April 7, 2014, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On January 4, 2011, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on December 15, 2008. Tr. at 79, 81, 130–36, 137–146. Her applications were denied initially and upon reconsideration. Tr. at 86–87 96–97, 99–100. On December 13, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 27–50 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 8, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 6–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 3, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 31. She completed the tenth grade, but later obtained a high school equivalency certificate and certification as a nurse's aide ("CNA"). Tr. at 33, 161. Her past relevant work ("PRW") was as a cook in a school cafeteria. Tr. at 44. She alleges she has been unable to work since December 15, 2008. Tr. at 31.

2.    Medical History

Plaintiff presented to Travis Novinger, M.D. ("Dr. Novinger"), on January 5, 2009, for evaluation of hypothyroidism and anxiety. Tr. at 253. She indicated she had been very nervous and anxious and was out of Klonopin. *Id.* Dr. Novinger checked Plaintiff's thyroid function and refilled her prescriptions for Synthroid and Klonopin. *Id.*

On May 5, 2009, Plaintiff presented to Dr. Novinger for low back pain that radiated down her right leg. Tr. at 252. Plaintiff was tender to palpation in her lower lumbar spine, but she had a negative straight-leg raise and her reflexes were normal. *Id.* Dr. Novinger prescribed Diclofenac Sodium and Prednisone and discussed referring Plaintiff for an epidural steroid injection. *Id.*

Plaintiff presented to Carisa R. Huggins, M.S.N., A.P.R.N., B.C. ("Ms. Huggins"), for follow up on January 25, 2010. Tr. at 250. Plaintiff was out of thyroid medication and stated she was resting well at night, but was sometimes sleeping during the day. *Id.* She complained of right fifth toe pain after tripping over her shoe. *Id.* Ms. Huggins observed tenderness and bruising at the base of the toe and across the top of Plaintiff's foot. *Id.* She decreased Plaintiff's dosage of Prozac, refilled her prescription for Synthroid, and referred her for blood work and an x-ray of her right foot. *Id.* The x-ray showed no acute trauma. Tr. at 231.

Plaintiff presented to Ms. Huggins on June 16, 2010, complaining of right ankle and left thumb pain resulting from a fall. Tr. at 248. Ms. Huggins noted swelling, prescribed Diclofenac 75 mg and Hydrocodone/APAP 5/500 mg, and referred Plaintiff for x-rays. *Id.* The x-ray of her right ankle indicated no fracture or dislocation. Tr. at 229.

The x-ray of her left finger showed a possible small avulsion injury off the base of the proximal phalanx of the thumb. Tr. at 230. Plaintiff followed up with Ms. Huggins on June 21, 2010, to have a left thumb spica splint replaced with a short-arm cast. Tr. at 249.

On July 19, 2010, Plaintiff complained to Ms. Huggins of low back pain radiating down her right leg. Tr. at 247. Ms. Huggins noted that Plaintiff had a MRI in 2007 that indicated disc bulges and mild early degenerative disc disease. *Id.* She observed Plaintiff to have tenderness mainly over the lumbar spine with positive straight-leg raise on the right. *Id.* She prescribed a seven-day tapered course of Prednisone and instructed Plaintiff to use Hydrocodone as needed. *Id.*

Plaintiff presented to Ms. Huggins on July 26, 2010, for examination, blood work, and urinalysis. Tr. at 246. She complained of a rash on her abdomen, low back pain radiating down her right leg, and anxiety. *Id.* Ms. Huggins observed tenderness over Plaintiff's lumbar spine. *Id.* She prescribed Darvocet N-100 for Plaintiff's back pain and referred Plaintiff for an x-ray of her lumbar spine. *Id.* The x-ray indicated mild scoliosis, but no acute findings. Tr. at 226. A mammogram and pelvic ultrasound performed on the same day also showed no abnormalities. Tr. at 227, 228.

On August 11, 2010, Plaintiff followed up with Ms. Huggins for low back pain that radiated down her right leg. Tr. at 245. Ms. Huggins observed tenderness over Plaintiff's lumbar spine and positive straight-leg raise on the right. *Id.* She referred Plaintiff for an MRI. *Id.*

Plaintiff underwent an MRI of her lumbar spine on August 12, 2010. Tr. at 232. It indicated degenerative disc dessication at T10-11; a loss of disc height with anterior and

posterior bulging of the disc at L2-3; mild anterior and posterior bulging at L3-4; mild facet arthropathy (right greater than left), disc desiccation of the posterior disc bulge, and a central annular tear at L4-5; and a small disc at L5-S1 with an enlarged right transverse process. Tr. at 232.

Plaintiff presented to Christopher G. Paramore, M.D., at Florence Neurosurgery and Spine on August 25, 2010. Tr. at 235–36. She complained of pain on the lower right side of her back that radiated down her leg and into her foot. Tr. at 235. Dr. Paramore observed normal gait, tenderness in the region of the right sacroiliac ("SI") joint, reduced lumbar range of motion, negative straight-leg raise, normal muscle strength in the bilateral upper and lower extremities, normal sensation, normal deep tendon reflexes, and negative Hoffman's reflex and Babinski's signs. Tr. at 236. Dr. Paramore indicated Plaintiff's lower back pain was likely due to right SI joint dysfunction. *Id.* He prescribed Naprosyn twice daily, referred Plaintiff for physical therapy, and instructed her to follow up in a month for a possible SI joint injection. *Id.*

Plaintiff followed up with Ms. Huggins on August 30, 2010, for low back pain. Tr. at 244. She indicated that she had seen the neurosurgeon, but that the consultation had not been helpful. *Id.* She also indicated that her prescription for Darvocet was not adequately controlling her pain. *Id.* Ms. Huggins referred Plaintiff for a physical therapy consultation and prescribed Diclofenac 75 mg, twice daily. *Id.* She also discontinued Plaintiff's prescription for Prozac and instructed Plaintiff to start Zoloft 50 mg, one-half tablet daily for seven days and one tablet daily thereafter. *Id.*

Plaintiff followed up with Ms. Huggins on October 27, 2010, regarding low back pain. Tr. at 243. Plaintiff informed Ms. Huggins that, although she had been unable to afford it earlier, she wanted to proceed with a referral for physical therapy. *Id.* Ms. Huggins prescribed Hydrocodone to be taken as needed for pain and referred Plaintiff for a physical therapy consultation. *Id.* She increased Plaintiff's prescription for Klonopin to 2 mg, one-half to one tablet, as needed. *Id.*

Plaintiff presented to Dr. Novinger on November 8, 2010, after becoming very upset when her grandson's birthday party was changed and she was not notified. Tr. at 242. Plaintiff complained of depressed mood and anhedonia and Dr. Novinger described her as having blunted affect and being anxious, nervous, and tearful. *Id.* She initially stated that "she felt like she could kill herself," but she later denied suicidal ideations and contracted for safety. *Id.* Dr. Novinger discontinued Plaintiff's prescription for Prozac and prescribed Pristiq 50 mg, once daily. *Id.* Dr. Novinger prescribed Abilify 5 mg and recommended counseling, but Plaintiff indicated she could not afford Abilify or counseling. *Id.*

Plaintiff followed up with Ms. Huggins on November 15, 2010, regarding anxiety and depression. Tr. at 241. Plaintiff stated that she was seeing some results, but was "eating her Klonopin like candy." *Id.* Her affect was flat, but Ms. Huggins noted no other abnormalities. *Id.* Ms. Huggins prescribed BuSpar 7.5 mg, twice daily. *Id.*

Plaintiff followed up with Ms. Huggins regarding anxiety and depression on November 30, 2010. Tr. at 240. Ms. Huggins noted Plaintiff also had a history of hypothyroidism, bilateral knee arthritis and pain, and low back pain. *Id.* Plaintiff

demonstrated full range of motion in her extremities, but she had crepitus over both knees. *Id.* Ms. Huggins described Plaintiff's affect as flat, but she indicated Plaintiff made good eye contact and denied anxiety and suicidal and homicidal ideations. *Id.* Ms. Huggins increased Plaintiff's dosage of BuSpar to 15 mg, twice daily. *Id.*

On December 20, 2010, Plaintiff complained to Ms. Huggins of elevated blood pressure accompanied by dizziness and headaches. Tr. at 238. Ms. Huggins prescribed Lisinopril/Hydrochlorothiazide 20/12.5 mg daily. Tr. at 238.

Plaintiff followed up with Ms. Huggins on January 14, 2011, for hypertension, anxiety, depression, and hypothyroidism. Tr. at 255. Plaintiff stated she discontinued her thyroid medication, Pristiq, and BuSpar because she "felt like she was going out of her mind" and was "tired all the time." *Id.* Ms. Huggins drew blood to check Plaintiff's thyroid and instructed her to restart BuSpar and Pristiq. *Id.*

On January 24, 2011, Ms. Huggins completed an assessment form regarding Plaintiff's mental condition. Tr. at 257. She indicated Plaintiff's diagnoses included anxiety and depression. *Id.* She wrote that Plaintiff was prescribed Pristiq, BuSpar, and Klonopin, but that medication had not completely helped Plaintiff's condition. *Id.* She indicated psychiatric care had not been recommended. *Id.* Ms. Huggins assessed Plaintiff's attention/concentration and memory to be adequate and her thought content to be appropriate. *Id.* She noted that Plaintiff was oriented to time, person, place, and situation. *Id.* However, she also indicated Plaintiff's thought process was slowed and her mood/affect was worried/anxious. *Id.* She suggested Plaintiff had "obvious" work-related

limitation of function due to her mental condition, but stated Plaintiff was capable of managing her own funds. *Id.*

State agency medical consultant Robert Dunn, M.D., completed a physical residual functional capacity assessment on March 31, 2011, in which he indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps/stairs, kneel, and crawl; never climb ladders/ropes/scaffolds; and avoid concentrated exposure to hazards. Tr. at 260–66.

On April 15, 2011, Plaintiff visited Aimar P. Mack, M.D. ("Dr. Mack"), for fluctuations in her thyroid function. Tr. at 267–69. Plaintiff complained of fatigue, joint and muscle aches, hair loss, pedal edema, headaches, difficulty concentrating, depression, mood swings, easy bruising, and a 30-pound weight gain over the previous six-month period. Tr. at 267–68. Dr. Mack advised Plaintiff that she was taking Levothyroxine incorrectly. Tr. at 269. He drew blood to perform several tests and instructed Plaintiff to follow up in the endocrinology clinic in 10 weeks. *Id.* After receiving the results of Plaintiff's thyroid function test, Dr. Mack instructed her to increase her dose of Levothyroxine to 137 mcg daily. Tr. at 270. Dr. Mack further noted Plaintiff's thyroid deficiency was "autoimmune in etiology" and her Vitamin D level was "okay," but he recommended she take a Vitamin D supplement. Tr. at 271.

Plaintiff presented to Ms. Huggins for increased blood pressure and headaches on April 27, 2011. Tr. at 306. She also complained of feeling more stressed and experiencing

recent moodiness. *Id.* Ms. Huggins indicated Plaintiff had flat affect and was tearful, but also noted Plaintiff was cooperative and pleasant, denied current anxiety, and endorsed no homicidal or suicidal ideations. *Id.* Plaintiff's prescription for Norvasc was increased to 10 mg daily, and Ms. Huggins instructed her to continue Pristiq 50 mg daily and to take one-half to one Klonopin 2 mg tablet, twice daily as needed. *Id.* Ms. Huggins also had blood drawn to determine the source of Plaintiff's reported fatigue. *Id.*

On April 30, 2011, Plaintiff was referred by Disability Determination Services to Katherine J. Kelly, Ph.D. ("Dr. Kelly"), for a mental status evaluation. Tr. at 274. Plaintiff reported spending time with family and friends through dining out, watching television, and taking a three-day trip to Myrtle Beach. Tr. at 274–77. She stated she no longer attended church because "there was a lot of drama." Tr. at 274. She reported that she "got along 'well' with the supervisors and co-workers" when she worked. *Id.* Plaintiff stated her typical daily activities included taking her son to school, folding laundry with her daughter's assistance, watching television, using the computer, and taking a nap. *Id.* She indicated she could shower, dress, and groom herself independently. *Id.* She acknowledged that she cooked, but stated she had to sit down while cooking. *Id.* She indicated she was able to do laundry and wash dishes, but stated she was unable to sweep, clean, dust, or make her bed and had difficulty finishing other tasks. *Id.* She acknowledged that she drove and engaged in grocery shopping. *Id.* She reported crying, mood swings, and memory problems, but denied suicidal ideation, hallucinations, and manic symptoms. Tr. at 275. Plaintiff performed well on the Mini-Mental Status Examination. Tr. at 276. She had good memory and recall and read and comprehended

directions well. *Id.* Dr. Kelly assessed major depressive disorder, mild to moderate and anxiety disorder, NOS. Tr. at 277. Dr. Kelly indicated Plaintiff's judgment and insight were within normal limits and her social functioning was unrestricted. *Id.*

On May 2, 2011, Plaintiff presented to Ms. Huggins after being assaulted during an altercation with another woman. Tr. at 305. She complained of right shoulder and low back pain, bruises on her left upper arm and forehead, and headache. *Id.* An x-ray of Plaintiff's right shoulder was normal. Tr. at 279.

On May 3, 2011, state agency consultant Kevin King, Ph.D. ("Dr. King"), completed a psychiatric review technique and considered major depressive disorder and anxiety disorder. Tr. at 286–98. He found Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, but mild restriction of activities of daily living. Tr. at 296. Dr. King also completed a mental residual functional capacity assessment in which he found Plaintiff to be moderately limited with respect to the following abilities: to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 300–02. Dr. King specified the following:

> The Cl demonstrates the capacity to understand, remember, and carry out simple instructions. Cl can attend to a simple task without special supervision. Cl can maintain personal hygiene, and make simple work-related decisions. Cl would work best with limited contact with the general public. Cl would respond best to positive supervision. Cl can recognize and avoid normal workplace hazards, and use public transportation.

Tr. at 302.

On May 9, 2011, Plaintiff presented to Ms. Huggins complaining of lower extremity edema that began over the prior weekend. Tr. at 304. Ms. Huggins suggested the edema resulted from Plaintiff's increased dose of Norvasc. *Id.* She decreased the Norvasc to one-half tablet daily, but added Maxzide to keep Plaintiff's blood pressure under control. *Id.*

On June 21, 2011, state agency consultant Timothy Laskis, Ph.D. ("Dr. Laskis"), completed a psychiatric review technique in which he assessed major depressive disorder and anxiety disorder and determined Plaintiff had mild restriction of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. Tr. at 308–20. Dr. Laskis also completed a mental residual functional capacity assessment in which he indicated Plaintiff was moderately limited with respect to the following abilities: to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with

the general public; and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 322–23. Dr. Laskis further specified the following:

> [T]he claimant demonstrates the capacity to understand, remember, and carry out simple instructions. Claimant can attend to simple tasks without special supervision. Claimant can maintain personal hygiene, and make simple work related decisions. Claimant would work best with limited contact with the general public. Claimant would respond best to positive supervision. Claimant can recognize and avoid normal workplace hazards, and use public transportation.

Tr. at 323.

On July 19, 2011, state agency medical consultant Rebecca Meriwether, M.D., completed a physical residual functional capacity assessment in which she indicated Plaintiff was limited as follows: lift and/or carry 20 pounds occasionally and less than 10 pounds frequently; stand about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; climb ramps/stairs, balance, stoop, kneel, crouch, and crawl occasionally; and never climb ladders/ropes/scaffolds. Tr. at 326–33.

Plaintiff followed up with Dr. Novinger on July 18, 2011, for evaluation of degenerative disc disease of the lumbar spine. Tr. at 347–48. Dr. Novinger observed point tenderness to the right side of Plaintiff's lumbar spine and negative straight-leg raise. Tr. at 347. Dr. Novinger noted Plaintiff had taken 16 more Hydrocodone pills than she was supposed to take. Tr. at 348. He indicated "[s]he has been having increasing symptoms of pain to her back and she had to take more." *Id.* Dr. Novinger referred Plaintiff for physical therapy and prescribed Ultram 50 mg and Flexeril 10 mg. *Id.*

On August 15, 2011, Plaintiff complained to Ms. Huggins of low back pain radiating down her left leg and multiple joint pains in her hands and feet. Tr. at 345. She

requested a referral to a pain management physician. *Id.* Ms. Huggins observed Plaintiff

to have tenderness in her lumbar spine and a positive straight-leg raise on the left. *Id.* Ms.

Huggins drew Plaintiff's blood for testing and referred Plaintiff to Bruce Johnson, M.D.

("Dr. Johnson") at McLeod Pain Management. *Id.*

Plaintiff presented to Ms. Huggins on September 21, 2011, complaining of right-

sided neck pain. Tr. at 342. Ms. Huggins noted that Plaintiff tested positive for

Mononucleosis ("Mono"). Ms. Huggins observed a large, swollen area over the entire

right side of Plaintiff's neck that was tender to touch. *Id.* She referred Plaintiff for a CT

scan and prescribed a seven-day Prednisone taper and 10 Norco 10/650 mg tablets. *Id.*

On September 23, 2011, Ms. Huggins informed Plaintiff that the CT results were

consistent with the diagnosis of Mono and that she may be tired for the next two to three

months while she recovered. Tr. at 341.

Plaintiff presented to Ms. Huggins on November 7, 2011, complaining that she felt

tired "all the time." Tr. at 340. Plaintiff reported low back pain, but stated she did not

desire to return to pain management because she was reluctant to try epidural steroid

injections. *Id.* Ms. Huggins observed Plaintiff to be tender over her lower lumbar spine.

*Id.* She increased Plaintiff's dosage of Seroquel XR to 300 mg, but noted that she was

unable to prescribe narcotic pain medication because of Plaintiff's positive drug test. *Id.*

On January 3, 2012, Plaintiff complained to Ms. Huggins of mood outbursts and

depression. Tr. at 339. She explained her dog had recently died and she discovered the

woman with whom her husband was having an affair was pregnant. *Id.* Ms. Huggins

observed Plaintiff to have tenderness over her lumbar spine and flat affect. *Id.* She

prescribed Mobic, but noted she was unable to prescribe narcotics because Plaintiff tested positive for substances that she was not prescribed. *Id.* Ms. Huggins encouraged Plaintiff to consult Tri-County Mental Health and increased Plaintiff's prescriptions for Seroquel XR and Cymbalta. *Id.*

Plaintiff followed up with Ms. Huggins for hypokalemia and back pain on February 29, 2012. Tr. at 338. Plaintiff reported she had been to pain management, but was reluctant to receive an epidural steroid injection. *Id.* Ms. Huggins observed Plaintiff to be tender over her lower lumbar spine and she noted Plaintiff had pain that radiated down her right leg. *Id.* Dr. Huggins encouraged Plaintiff to obtain the epidural injection and explained that it was unlikely to cause the blood pressure drop that Plaintiff experienced in the past. *Id.*

On April 23, 2012, Plaintiff followed up with Ms. Huggins for bipolar disorder. Tr. at 337. Plaintiff reported that she missed an appointment at Tri-County Mental Health and had difficulty rescheduling an appointment. *Id.* She requested to be referred to a different psychiatrist. *Id.* Plaintiff reported attending a pain management visit at First Choice, but requested that she be referred to Dr. Johnson at McLeod for pain management. *Id.* She complained of weight gain, hypertension, and lower extremity edema. *Id.* Ms. Huggins observed Plaintiff to have flat affect, but noted no other abnormalities. *Id.*

On May 7, 2012, Plaintiff visited Dr. Johnson for pain management, but he noted Plaintiff was still afraid to undergo epidural injection. Tr. at 351.

On May 21, 2012, Plaintiff presented to Avie Rainwater, M.D. ("Dr. Rainwater"), for an initial psychological consultation. Tr. at 354–55. Plaintiff informed Dr. Rainwater that she was a hoarder and was impulsive. Tr. at 354. She also indicated that she had a high need for attention and had significant fear of loneliness and abandonment. *Id.* Plaintiff indicated she was easily angered and short-tempered. *Id.* Dr. Rainwater included impressions of major depressive disorder and hoarding and indicated that bipolar disorder and/or histrionic grief needed to be ruled out. Tr. at 355.

On May 22, 2012, Dr. Rainwater spoke with Ms. Huggins and concluded that Plaintiff was not bipolar, but exhibited behavioral and mood extremes. Tr. at 357. Dr. Rainwater indicated Plaintiff had symptoms of dysthymia, hoarding, and major depressive disorder, but that the major depressive disorder was situational due to Plaintiff's husband's affair. *Id.* Dr. Rainwater recommended that Ms. Huggins decrease all of Plaintiff's medications in favor of a mood stabilizer/neuromodulator. *Id.* Dr. Rainwater and Ms. Huggins discussed Plaintiff's refusal to come for treatment, and Ms. Huggins indicated she would encourage Plaintiff to follow up. *Id.*

Plaintiff complained to Ms. Huggins of fatigue on June 13, 2012. Tr. at 335. She stated she felt "like she could sleep all day." *Id.* She complained of leg cramps, but stated she had not recently filled her prescription for potassium. *Id.* She indicated she had visited a pain specialist for low back pain who recommended epidural steroid injections, but she had not had them done. *Id.* Ms. Huggins continued Plaintiff's dose of Synthroid, refilled Tramadol, Klor-Con, and Mobic, decreased Seroquel XR to 300 mg, discontinued

BuSpar, and increased the dosage of Lotrel for hypertension. Tr. at 336. She encouraged Plaintiff to return to pain management and to seek psychiatric treatment. *Id.*

Plaintiff followed up with Ms. Huggins on September 25, 2012, complaining of low back pain. Tr. at 371. Plaintiff stated she stopped taking Tramadol and her potassium supplement. *Id.* She requested a prescription for Hydrocodone. *Id.* She complained of memory problems and anger outbursts. *Id.* Dr. Huggins noted that Plaintiff needed to obtain treatment at Tri-County Mental Health, but that they were unwilling to schedule an appointment with Plaintiff because she had missed two prior appointments. *Id.* Ms. Huggins reminded Plaintiff that she could not prescribe narcotics to her and instead prescribed Meloxicam and encouraged her to take Tramadol as needed. Tr. at 372.

On October 1, 2012, Plaintiff followed up with Ms. Huggins for hypocalcemia, hypothyroidism, depression, hypokalemia, borderline personality disorder, and chronic low back pain. Tr. at 369. Plaintiff indicated she was experiencing a burning sensation in the sides of her legs on most days. *Id.* Plaintiff indicated her anxiety and depression had worsened because she discovered that her daughter's unborn child would require heart surgery at birth. *Id.* Ms. Huggins prescribed Neurontin 300 mg, three times daily, for Plaintiff's back pain. Tr. at 370. Ms. Huggins noted that she was prescribing Depakote ER 500 mg to be taken at bedtime and that the providers at Tri-County Mental Health recommended she wean Plaintiff from her other medications before Plaintiff presented to them for treatment. *Id.* Ms. Huggins wrote a letter in which she indicated Plaintiff had a history of chronic low back pain with radiculopathy due to degenerative disc disease at T10-11, a disc bulge at L2-3, and multiple problems at L4-5, including a disc bulge, a

16

central annular tear, and facet arthropathy, right greater than left. Tr. at 358. Ms. Huggins stated Plaintiff took daily pain medication that could not control her symptoms on most days. *Id.* She also indicated Plaintiff had borderline personality disorder for which she took multiple medications. *Id.* Ms. Huggins indicated "[p]lease consider her disabled for work physically and mentally." *Id.*

Plaintiff presented to Tri-County Mental Health for an initial clinical assessment on November 7, 2012. Tr. at 375–79. Plaintiff complained of anxiety, marital trouble, depressed mood, poor sleep, increased appetite, financial stress, and hoarding. Tr. at 375. Plaintiff reported that she scratched her stomach until it bled when experiencing anxiety attacks. *Id.* She indicated she was having difficulty dealing with her husband's affair and the death of a close friend. *Id.* Plaintiff indicated she had passive thoughts of killing herself or her husband, but that she would not actually do it. *Id.* Bonnie Cundiff, L.P.C., assessed adjustment disorder with mixed anxiety and depressed mood and a Global Assessment of Functioning ("GAF")[1] score of 50. Tr. at 379.

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* However, the Fifth Edition of the *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM-V*") does not include the GAF scale for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013. The *DSM-V* instead uses the World Health Organization's Disability Assessment Schedule ("WHODAS") to provide a global measure of disability.

Plaintiff presented to Christian F. Reusche, M.D. ("Dr. Reusche"), for an initial psychiatric assessment on November 21, 2012. Tr. at 382–84. Plaintiff reported problems with anger and lashing out and stated she could not get past her husband cheating on her. Tr. at 382. She reported her sleep, energy, and concentration were poor. *Id.* She stated her appetite had increased, causing her to gain 50 pounds over the previous year. *Id.* She complained of panic attacks without agoraphobia that lasted a few minutes and occurred two to three times per month. *Id.* Dr. Reusche indicated Plaintiff's mental status examination was normal, except that he found her to have fair judgment and insight. Tr. at 383. He assessed diagnoses of panic disorder without agoraphobia, partner relational problem, and depressive disorder, NOS and suggested major depressive disorder and intermittent explosive disorder needed to be ruled out. *Id.* He assessed a GAF score of 58. *Id.* Dr. Reusche prescribed Propranolol, Elavil, Depakote ER, and Cymbalta. *Id.*

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing on December 13, 2012, Plaintiff testified she lived in a mobile home with her husband and 16-year-old son. Tr. at 31. She stated she was five feet, five inches tall and weighed 240 pounds, which was an increase of 40 pounds from the prior year. Tr. at 31–32. She indicated she was right handed. Tr. at 32. She acknowledged that she had a driver's license and drove a couple of times per week, but stated that her husband typically did most of the driving. *Id.* Plaintiff stated she took Cymbalta,

18

Meloxicam, two medications for hypertension, and one medication for a thyroid disorder. Tr. at 34.

Plaintiff testified she experienced right-sided lower back pain that ran into her right leg. Tr. at 37. She described it as feeling like "someone is taking a saw and sawing my back." *Id.* Plaintiff indicated she also experienced pain in her right foot while standing. Tr. at 38. She confirmed that she experienced swelling and arthritis-related pain in her knees. Tr. at 39. She stated she had carpal tunnel syndrome in her right hand that caused pain to shoot from her pinky finger up her arm. *Id.* She indicated she had some difficulty retaining her grip and holding items like a broom and gallon of milk with her right hand. Tr. at 39–40. She confirmed that her blood pressure was well-controlled on medication. Tr. at 40.

Plaintiff testified her family doctor referred her to the mental health clinic because her family doctor could not adequately treat her mental impairments. Tr. at 40. She indicated her medications were recently adjusted. Tr. at 40–41. Plaintiff stated she experienced crying spells two to three times per week that lasted about 20 minutes. Tr. at 41. She indicated her depressive symptoms were exacerbated by her mother's health problems. *Id.* Plaintiff stated she had experienced panic attacks for 15 years, but complained they had worsened over the prior five-year period and occurred once or twice per week. Tr. at 41–42. She described a panic attack as lasting two to three minutes and feeling "like I can't breathe" and "like I'm going to die." Tr. at 42.

Plaintiff acknowledged attending treatment with a pain management physician, but stated she discontinued treatment because she was scared of receiving an epidural steroid

injection. Tr. at 43. Plaintiff indicated her blood pressure had dropped dangerously low in response to an epidural steroid injection she received in the past. *Id.*

Plaintiff testified her pain was worsened by standing and remaining in one position for too long. Tr. at 37. She indicated she sat in a reclined position on the sofa for about 45 minutes at a time. *Id.* She stated she would generally lie on a heating pad in her bed for two to three hours. *Id.* She indicated she could stand in one spot for no longer than 15 minutes. Tr. at 38. When asked how long she could sit in a non-reclined position, Plaintiff stated "[p]robably 30, 40 minutes." *Id.*

Plaintiff testified that she typically awoke between 8:30 and 9:00 a.m. Tr. at 35. She indicated she ate breakfast and sat on the sofa for "a little while." *Id.* She stated she did not always eat lunch, but when she ate lunch, she did so around 1:00 p.m. Tr. at 35. She testified that she alternated between the sofa and her bed, where she watched television for most of the day. *Id.* She indicated her family ate dinner between 7:00 and 8:00 p.m. *Id.* She stated she retired to bed around between 11:00 p.m. and midnight. Tr. at 36.

Plaintiff stated her husband performed all of the household chores and began doing all of the cooking a month earlier. *Id.* She indicated that before her husband assumed responsibility for the cooking, she prepared sandwiches and canned foods. *Id.* She stated her husband washed the clothes, but brought them to the sofa or to her bed for her to fold. *Id.*

Plaintiff testified that she visited the grocery store once or twice per month, where she pushed and leaned on the shopping cart. Tr. at 36. She denied attending church. *Id.*

She stated she visited her parents' house three times per week because her mother was under hospice care. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Carroll H. Crawford reviewed the record and testified at the hearing. Tr. at 44–49. The VE categorized Plaintiff's PRW as a cook, *Dictionary of Occupational Titles* ("*DOT*") number 313.381-030, as medium and semi-skilled with a specific vocational preparation ("SVP") of six. Tr. at 44.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; was limited to unskilled work and/or routine, repetitive tasks; was limited to occasional contact with the public; and could not perform production-pace work, but could perform goal-oriented work. Tr. at 45. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. Tr. at 46. The VE identified light and unskilled jobs as a cafeteria attendant, *DOT* number 311.677-010, with 1,600 jobs in South Carolina and 112,000 jobs in the national economy; a garment sorter, *DOT* number 222.687-014, with 1,400 jobs in South Carolina and approximately 98,000 nationwide; and a garment folder, *DOT* number 789.687-066, with 1,600 jobs in South Carolina and 112,000 nationwide. *Id.*

21

The ALJ posed a second hypothetical question in which she described an individual of Plaintiff's vocational profile who could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; could stand and/or walk at least two hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; was limited to unskilled work and/or routine, repetitive tasks; could have occasional contact with the public; and could not perform production-pace work, but could perform goal-oriented work. Tr. at 46. She asked if the hypothetical individual would be able to perform any of Plaintiff's PRW. *Id.* The VE testified that the individual could not perform Plaintiff's PRW. *Id.* The ALJ asked if there were any jobs available in the local or national economy that the individual could perform. Tr. at 47. The VE testified that the individual could perform sedentary, unskilled work as an order clerk, *DOT* number 209.567-014, with 2,100 jobs in South Carolina and approximately 140,000 jobs nationwide; a weight tester, *DOT* number 539.485-010, with 1,200 jobs in South Carolina and 84,000 jobs nationwide; and a charge account clerk, *DOT* number 205.367-014, with 1,700 jobs in South Carolina and 119,000 jobs nationwide. *Id.*

The ALJ posed a third question in which she asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony. *Id.* The ALJ asked if this individual could perform Plaintiff's PRW. *Id.* The VE testified that the individual could not perform Plaintiff's PRW. *Id.* The ALJ asked if the hypothetical individual could perform any work available in the local or national economy. *Id.* The VE testified that the individual could not perform any work

because "the level of activity described in the testimony" was "not consistent with any full-time work." Tr. at 48. The VE confirmed that his testimony was consistent with the *DOT*. *Id.*

Plaintiff's attorney asked the VE to assume that the hypothetical individual would miss three to four days of work per month because of severe pain and depression with panic attacks and crying spells. *Id.* He asked if the individual would be able to perform any of the light or sedentary jobs identified in response to the first and second hypothetical questions. *Id.* The VE testified that the individual would be able to perform no full-time work. *Id.*

Plaintiff's attorney next asked the VE to assume that the individual would be distracted after 30 to 45 minutes due to pain and would not be able to maintain attention, concentration, or pace. *Id.* He asked if the individual could perform the jobs identified in response to the first and second hypothetical questions. *Id.* The VE testified that the individual could not perform the jobs because she was not able to maintain attention for long enough to engage in full-time work. *Id.*

### 2.    The ALJ's Findings

In her decision dated February 8, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.
2.    The claimant has not engaged in substantial gainful activity since December 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: obesity; degenerative disc disease; major depressive disorder, moderate; anxiety disorder, not otherwise specified (NOS) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with the following limitations: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; unskilled work and/or routine repetitive tasks; occasional contact with the public; no production pace work (e.g. assembly line); can perform goal-oriented work (e.g. cleaner).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 1, 1964, and was 44 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 11–21.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to properly address the severity of Plaintiff's documented impairments;

2) the ALJ neglected to properly assess her RFC based on the requirements of SSR 96-8p;

24

3)      the ALJ posed improper hypothetical questions to the VE that did not include all limitations supported by the record; and

4)      the ALJ did not properly assess Plaintiff's credibility under SSR 96-7p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

25

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must

27

carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.      Analysis

      1.      Severity of Impairments Under SSR 96-3p

Plaintiff argues that the ALJ erred in determining that right foot spur, arthritis and swelling in her knees, and right carpal tunnel syndrome were non-severe impairments and in failing to assess the severity of her borderline personality disorder, panic disorder without agoraphobia, and bipolar disorder. [ECF No. 17 at 14].

The Commissioner argues that the ALJ's findings regarding Plaintiff's severe impairments were supported by the record. [ECF No. 19 at 7–8]. She further maintains Plaintiff had no functional limitations that prevented her from performing the jobs identified by the VE that resulted from right foot spur, arthritis and swelling in the knees, right carpal tunnel syndrome, borderline personality disorder, panic disorder without agoraphobia, and borderline personality disorder. *Id.* at 8.

An individual cannot be found disabled unless she has a severe medically-determinable physical or mental impairment or combination of impairments. SSR 96-3p. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also* SSR 96-3p. It

28

"must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). It "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p *citing* SSR 85-28.

In view of the foregoing authority, the undersigned addresses the additional impairments Plaintiff alleges.

> a.    Right Foot Spur, Arthritis and Swelling of the Bilateral Knees, and Right Carpal Tunnel Syndrome

The ALJ addressed Plaintiff's allegation that right foot spur, arthritis and swelling in the bilateral knees, and right carpal tunnel syndrome were severe impairments, but she concluded the following:

> X-rays of the right foot revealed a spur off the plantar surface of the calcaneus. However, the bones of the foot were otherwise intact with no evidence of acute fracture or dislocation or acute trauma (Exhibit 1F/6). X-rays of the right ankle showed the bones of the ankle were intact with no evidence of acute fracture or dislocation (Exhibit 1F/4). After a fall in which the claimant experienced thumb pain, x-rays of the left finger showed small avulsion injury off the base of the proximal phalanx of the thumb, which required a thumb splint. Otherwise, the visualized bony structures were intact (Exhibit 1F/5). The clinical findings revealed the claimant had some crepitus over the knees. The clinical findings show the claimant had 5/5 strength and normal gait and station. She had no evidence of chronic joint inflammation, swelling, stiffness, edema, or instability in any joint. The claimant did not require EMG/nerve conduction study or treatment by an orthopedic specialist or rheumatologist. She did not require frequent emergency room treatment due to pain and did not require physical therapy, occupational therapy, or surgery due to any of these impairments or subjective complaints. Accordingly, the medical evidence fails to

29

> establish these impairments impose more than minimal functional limitations upon the claimant; therefore, these are "nonsevere" impairments as defined in the regulations.

Tr. at 12.

The undersigned finds that the evidence supports the ALJ's conclusion that right foot spur, arthritis and swelling in the knees, and right carpal tunnel syndrome were non-severe impairments. Although the record contains medical documentation to support the existence of these impairments, nothing in the record, other than Plaintiff's testimony, suggests that these impairments imposed more than minimal limitations on Plaintiff's ability to perform work activity. Plaintiff received regular medical treatment between 2009 and 2012 and often saw Ms. Huggins more than once a month. Despite frequent treatment, Plaintiff only complained of these problems on two occasions. On November 30, 2010, Plaintiff complained of bilateral knee pain. Tr. at 240. Ms. Huggins prescribed Diclofenac to be taken twice daily, and Plaintiff did not complain of knee pain thereafter. *Id.* On August 15, 2011, Plaintiff complained to Ms. Huggins of joint pain in her hands and feet. Tr. at 345. Ms. Huggins drew Plaintiff's blood to check sed rate, ANA, and rheumatoid factor, which were presumably normal, and Plaintiff did not complain about pain in her hands or feet at subsequent visits. *Id.* In light of Plaintiff's few complaints and her lack of grievances after conservative treatment was initiated, the undersigned finds that the ALJ did not err in failing to assess right foot spur, arthritis and swelling in the bilateral knees, and right carpal tunnel syndrome to be severe impairments.

b.     Borderline Personality Disorder, Panic Disorder Without Agoraphobia, and Bipolar Disorder

Although the ALJ cited diagnostic impressions of borderline personality disorder and panic disorder without agoraphobia in the treatment history, she did not address Plaintiff's alleged impairments of borderline personality disorder, panic disorder without agoraphobia, and bipolar disorder. *See* Tr. at 15, 16.

The undersigned's review of the record reveals multiple diagnostic impressions and provisional diagnoses related to Plaintiff's mental health. On January 24, 2011, Ms. Huggins indicated on a mental assessment form that Plaintiff was diagnosed with anxiety and depression. Tr. at 257. *Id.* Dr. Kelly assessed major depressive disorder, mild to moderate, and anxiety disorder, NOS, following the consultative examination on April 30, 2011. Tr. at 277. On November 7, 2011, Ms. Huggins indicated a diagnostic impression of bipolar disorder. Tr. at 340. Ms. Huggins referred Plaintiff to Dr. Rainwater, who initially diagnosed major depressive disorder and hoarding, but indicated that borderline personality disorder and/or histrionic grief needed to be ruled out. Tr. at 355. Dr. Rainwater conferred with Ms. Huggins on May 22, 2012, and concluded that Plaintiff was not bipolar, but exhibited behavioral and mood extremes and symptoms of dysthymia, hoarding, and situational major depressive disorder. Tr. at 357. Notes from treatment visits on June 13, 2012, September 25, 2012, and October 12, 2012, and Ms. Huggins's October 12, 2012, letter indicated Plaintiff was diagnosed with borderline personality disorder. Tr. at 335, 358, 370, 372. Ms. Cundiff at Tri-County Mental Health assessed adjustment disorder with mixed anxiety and depressed mood. Tr. at 379. Dr. Reusche assessed panic disorder without agoraphobia, partner relational problem, and

31

depressive disorder, NOS, and suggested major depressive disorder and intermittent explosive disorder needed to be ruled out. Tr. at 383.

Here, we have five different providers who all assessed different diagnoses. Four of the five providers were mental health professionals, but they each formed their diagnostic impressions based upon a single interaction with Plaintiff. The fifth, Ms. Huggins, had a longstanding treatment relationship with Plaintiff, but was not a mental health professional and provided no evidence to support her diagnostic impression. Although Ms. Huggins indicated a diagnostic impression of bipolar disorder in November 2011, it appears that both she and Dr. Rainwater ruled out bipolar disorder in May 2012. *See* Tr. at 340, 357. Thereafter, Ms. Huggins indicated Plaintiff had borderline personality disorder and she purported to base that conclusion on Dr. Rainwater's impression. *See* Tr. at 335. However, Dr. Rainwater did not diagnose borderline personality disorder, but instead suggested Plaintiff undergo further testing to determine if she had borderline personality disorder, histrionic personality disorder, or a mixed disorder. *See* Tr. at 357. Plaintiff underwent two subsequent assessments by Ms. Cundiff and Dr. Reusche at Tri-County Mental Health, and neither of these mental health professionals indicated diagnostic impressions that included borderline personality disorder. *See* Tr. at 379, 383. As for the diagnosis of panic disorder without agoraphobia, the undersigned finds that it was reasonable for the ALJ to not assess this as an impairment because it was diagnosed by Dr. Reusche after only one treatment visit and was not substantiated by any of the other four providers. *See* Tr. at 382–84.

The undersigned concludes that the ALJ's determination that major depressive disorder and anxiety disorder were severe impairments and that Plaintiff had no other severe mental impairments was supported by substantial evidence. Dr. Rainwater (examining psychiatrist), Dr. Kelly (examining psychologist), Dr. King (state agency consultant, psychologist), Dr. Laskis (state agency consultant, psychologist), and Ms. Huggins all diagnosed major depressive disorder. *See* Tr. at 257, 277, 355, 357, 286–98, 308–20. Drs. Kelly, King, and Laskis and Ms. Huggins also indicated Plaintiff had an anxiety disorder. *See* Tr. at 257, 277, 286–98, 308–20. The ALJ reasonably compared multiple diagnostic impressions, rejected those that found little support in the record, and determined Plaintiff to have the impairments that were well-supported.

2.     Assessment of RFC Under SSR 96-8p

Plaintiff argues that the ALJ failed to properly consider her combination of impairments under SSR 96-8p. [ECF No. 17 at 14]. She maintains that the ALJ failed to contemplate the effects of right foot bone spur, arthritis and swelling in her knees, right carpal tunnel syndrome, panic disorder without agoraphobia, bipolar disorder, and borderline personality disorder on her ability to work. *Id.* Plaintiff contends the ALJ neglected to consider the limitations imposed by side effects of her prescribed medications and her documented need to change positions throughout a typical day. *Id.* at 15.

The Commissioner argues the ALJ considered the entire record in assessing Plaintiff's RFC and specifically maintains that the ALJ discussed the side effects of Plaintiff's medications in assessing Plaintiff's RFC. [ECF No. 19 at 8–9].

"RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities on a regular and continuing basis." SSR 96-8p. When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's RFC and her disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* However, the Fourth Circuit later indicated that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716791 (D.S.C. Aug. 28, 2012) (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

In determining a claimant's RFC, the ALJ should only consider functional limitations and restrictions resulting from medically-determinable impairments and should consider the individual to have no limitation or restriction to RFC if the record

does not support the existence of limitations. *Id.* The RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule, describe the maximum amount of each work-related activity the individual can perform based upon the evidence in the case record, and resolve any material inconsistencies or ambiguities in the evidence. *Id.*

The ALJ explained that she assessed the RFC "[u]pon review of the total evidence of record, and in consideration of the combined effect of the claimant's impairments, including all severe impairments, nonsevere impairments, and subjective complaints." Tr. at 18.

The undersigned finds the ALJ considered Plaintiff's impairments in combination. The ALJ explained that the evidence supported Plaintiff's allegations of chronic back and right lower extremity pain, but that the objective findings did not suggest the presence of severe pain and significant functional limitations resulting from Plaintiff's degenerative disc disease. *See* Tr. at 17. She considered that Plaintiff's obesity "could exacerbate her back pain" and found that, because of Plaintiff's combination of back pain and obesity, she was limited to lifting and/or carrying 10 pounds occasionally and less than 10 pounds frequently, standing and/or walking at least two hours in an eight-hour workday, sitting about six hours in an eight-hour workday, and only occasionally climbing ramps/stairs,

35

balancing, stooping, kneeling, crouching, and crawling. *See id.* The ALJ also considered major depressive disorder and anxiety disorder, NOS, in combination. *See* Tr. at 18. She cited evidence to suggest Plaintiff's medications generally controlled her symptoms and an absence of severe symptoms such as mania, suicidal thoughts, hallucinations, delusions, easy distractibility, frequent panic attacks, irrational fears, obsessions, or compulsions. *See id.* Then, she determined that Plaintiff was limited to unskilled, repetitive tasks with no more than occasional contact with the public, with no production-pace work. *See id.* Not only did the ALJ state that she considered Plaintiff's impairments in combination, the undersigned's reading of the decision as a whole reveals that the ALJ considered the combined impairments in assessing Plaintiff's RFC.

The undersigned rejects Plaintiff's argument that the ALJ was required to specifically consider the effects of right foot spur and bilateral knee swelling and pain on Plaintiff's functional abilities. As indicated above, Plaintiff registered very few complaints about right foot and bilateral knee pain. Although Plaintiff alleges that right foot spur and bilateral knee swelling and pain affected "her ability to walk and stand and use her lower extremities to do basic work activities of standing, walking, and sitting," she points to no evidence in the record to support these additional limitations. *See* ECF No. 17 at 14. In contrast, the ALJ cited objective evidence that included normal gait, an absence of lower extremity instability, and normal range of motion to support her RFC assessment. *See* Tr. at 12, 17. Furthermore, while the ALJ did not specifically note that she considered Plaintiff's bilateral knee arthritis and pain and right foot spur in the RFC assessment, the ALJ imposed limitations on Plaintiff's ability to stand and walk, finding

36

she could stand and walk for at least two hours in an eight-hour workday, but could sit for about six hours in an eight-hour workday. *See* Tr. at 13. The ALJ further indicated that Plaintiff could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and could never climb ladders, ropes, or scaffolds. *See id.* The undersigned finds that the record did not require the ALJ to assess any additional limitations based upon Plaintiff's right foot spur and bilateral knee pain.

The undersigned also rejects Plaintiff's argument that the ALJ was required to assess specific restrictions based upon panic disorder without agoraphobia, bipolar disorder, and borderline personality disorder. As discussed above, the record contains conflicting diagnoses from Plaintiff's mental health providers, so the undersigned declines to find that the ALJ should have imposed specific limitations based on any of these three diagnoses. Nonetheless, the undersigned considers Plaintiff's argument that the ALJ should have found greater limitations on her abilities to "engage in occasional contact with the general public, contact with supervisors and co-workers, performing goal-oriented work, and frankly being able to perform work on a regular and continuing basis." *See* ECF No. 17 at 14. Plaintiff essentially argues that the ALJ found her to have fewer limitations than she actually had, but Plaintiff cites no evidence to suggest that her limitations were greater and provides no proof to support the presence of additional limitations. The ALJ supports the mental component of the assessed RFC by referring to an absence of evidence to suggest Plaintiff "suffered from manic syndrome, feelings of guilt, thoughts of suicide, hallucinations, delusions, or easy distractibility" or that she had

"severe or frequent panic attacks, persistent or irrational fears that were a source of marked distress, or recurrent obsessions or compulsions." *See* Tr. at 18.

The undersigned finds that the ALJ considered the side effects of Plaintiff's medications. Plaintiff specifies no evidence to support her argument that her medications made her feel drowsy during the day. *See* ECF No. 17 at 15. The ALJ acknowledged that Plaintiff "reported her medication caused her to feel tired and sluggish" and stated that she considered the possible side effects of medications in limiting Plaintiff to unskilled repetitive tasks with no more than occasional contact with the public and in precluding Plaintiff from performing production-pace work. *See* Tr. at 18. Based on an absence of evidence in the record to support further limitations, the undersigned finds that the ALJ adequately considered the side effects of Plaintiff's medications.

The undersigned further finds that the ALJ was not required to include a sit-stand option in Plaintiff's assessed RFC. Although Plaintiff indicated in the disability reports and her testimony that she alternated between the sofa and her bed throughout the day, her medical records fail to reflect a need for frequent changes between sitting and standing. As discussed below, the ALJ found Plaintiff's statements to not be entirely credible. *See* Tr. at 17. Furthermore, the ALJ explained her reasons for assessing the limitations that she assessed and finding that no further exertional limitations were supported by the record. *Id.* The undersigned finds that the ALJ's decision to not include a sit-stand option in Plaintiff's RFC was supported by the record.

3.     Improper VE Hypotheticals

Plaintiff argues the ALJ presented improper hypotheticals to the VE that failed to include all limitations imposed by her moderate limitation in social functioning. [ECF No. 17 at 16]. Plaintiff maintains the ALJ failed to include in the hypothetical to the VE any indication that Plaintiff had difficulty relating to supervisors and co-workers. *Id.* She contends that, because the ALJ failed to include all of Plaintiff's impairments and limitations in the hypothetical question posed to the VE, the VE's responses were defective and the Commissioner failed to meet her burden at step five of the sequential evaluation process. *Id.* at 19.

The Commissioner argues the hypothetical questions posed by the ALJ to the VE adequately accounted for Plaintiff's documented restrictions. [ECF No. 19 at 9]. She reasons that there was no need for the ALJ to include any further restrictions in the hypothetical regarding Plaintiff's ability to interact with co-workers and supervisors based on Plaintiff's indication to Dr. Kelly that she got along well with her supervisors and co-workers when she was working. *Id.* at 9. She also maintains that the ALJ was not directed to include additional limitations with respect to Plaintiff's social functioning based on Plaintiff's reported social activities. *Id.*

At step five of the sequential evaluation, the Commissioner bears the burden to provide proof of a significant number of jobs in the national economy that a claimant could perform. *Walls*, 296 F.3d at 290. The VE's testimony is offered to assist the ALJ in meeting this requirement. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). For a VE's opinion to be relevant, "it must be based upon a consideration of all

other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

The undersigned finds that the record did not compel the ALJ to include additional limitations in the hypothetical to the VE. Although Dr. King indicated Plaintiff had moderate difficulties in maintaining social functioning and "would work best with limited contact with the general public," he did not indicate that Plaintiff would have difficulty interacting with co-workers and supervisors. *See* Tr. at 296, 302. Dr. Laskis specified the same restrictions. *See* Tr. at 318, 324. Furthermore, as recognized by the Commissioner, Plaintiff informed Dr. Kelly that she had no difficulty interacting with co-workers and supervisors in her former employment, and Dr. Kelly concluded that Plaintiff's social functioning was "unrestricted." *See* Tr. at 274, 277. The ALJ also considered Plaintiff's self-reported social interaction, which included grocery shopping, dining out one to two times per week, driving her son to and from school, socializing with family and friends, and buying and selling clothing on eBay. *See* Tr. at 13, 16. Plaintiff cites multiple examples in the record where she complained of lashing out at family members. *See* ECF No. 17 at 16. However, it appears that these incidents were often related to family matters that would not be present in a work environment (i.e., not notified that grandson's party

date was changed, conflict with daughter over daughter's boyfriend, marital conflict, consequences of marital infidelity). *See* Tr. at 242, 275, 337, 339, 354–55, 371, 375–84. Plaintiff cites no examples of Plaintiff lashing out at strangers or co-workers and only shows that she reported "lashing out" at those with whom she had a history of personal conflict. In light of the foregoing evidence, the record did not compel the ALJ to include additional limitations in her hypothetical questions to the VE.

4.    Credibility Assessment Under SSR 96-7p

Plaintiff argues that the ALJ did not adequately assess her credibility based on the requirements in SSR 96-7p. [ECF No. 17 at 18]. Plaintiff further contends that the ALJ repeatedly misstated and misinterpreted the record to support her conclusion that Plaintiff was not disabled. *Id.* 16–18.

The Commissioner argues that the ALJ appropriately considered all relevant factors and comprehensively discussed Plaintiff's credibility. [ECF No. 19 at 9–10].

Pursuant to SSR 96-7p, ALJs are guided by the following in assessing the credibility of claimant's statements:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of the objective medical evidence.
>
> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists about the symptoms and how they affect the individual, and

41

any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

To properly assess a claimant's credibility, the ALJ must consider the objective evidence in combination with the following factors:

1.    The individual's daily activities;
2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.    Factors that precipitate or aggravate the symptoms;
4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and
7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

The undersigned rejects Plaintiff's argument that the ALJ "did not actually make a credibility finding as required." *See* ECF No. 17 at 18. Plaintiff references the ALJ's statement that "the evidence as to the claimant's condition, activities, and capabilities,

including her testimony at the hearing as to pain and other subjective symptoms, is not consistent with the degree of disabling impairments she alleged." *See* Tr. at 18; ECF No. 17 at 18. She argues that the ALJ's determination that her testimony was "not consistent" was not the same as a credibility finding. *See* ECF No. 17 at 18. However, the undersigned finds it unnecessary to determine whether a finding that Plaintiff's testimony was "not consistent" is the same as a determination about her credibility because the ALJ did make a finding as to Plaintiff's credibility. The ALJ specifically concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects" of her symptoms "were not entirely credible." Tr. at 17.

The undersigned declines to find that the ALJ materially misstated Plaintiff's complaints in the function reports. Although Plaintiff correctly asserts she indicated limited daily activities, a need for assistance with household tasks, little social interaction outside her family, and difficulty completing tasks, Plaintiff also provided the specific responses referenced by the ALJ in the ALJ's explanation of her credibility finding. The ALJ explained the following:

> Despite the claimant's alleged impairments and subjective symptoms, the claimant was able to perform a wide variety of daily activities. On January 27, 2011, and June 29, 2011, the claimant reported that she was able to do a little housework, let the pets in and out of the house, take care of her personal hygiene, walk at the park, make fast and simple meals, do laundry, grocery shop for 20–30 minutes, dine out 1–2 times a week, handle finances, read, internet shop, and drive a car. She reported she had no problem following instructions, getting along with others, or handling changes in routine (Exhibit 3E, 8E). On November 21, 2012, the claimant reported she enjoyed going to auctions, shopping, and reading (Exhibit 23F/10). The claimant testified at the hearing that she drives occasionally, folds laundry while sitting on the floor, grocery shops once or twice a month and pushes the cart while leaning on it, and goes outside the house about three times a week. Although the claimant alleges that her

impairments prevent her from being able to perform any work activity, her ability to perform such activities as described is not consistent with an individual who is physically or mentally disabled and demonstrates that she has the capacity to use her upper and lower extremities and hands without significant limitations, and that she has the capacity to stand and walk on a limited basis and to lift, carry, and manipulate at least light objects. Her activities also demonstrate her mental impairments do not severely affect her ability to perform routine activities of daily living, engage in social activities, or perform simple, routine tasks for extended periods of time.

Tr. at 17. The undersigned's review of the function reports reveals that Plaintiff indicated she prepared simple meals for her family two to three times per week, washed clothes, drove within her town, shopped for food once per week, went out to eat, performed some household chores, read, watched television, used eBay, and could maintain attention for "a while." *See* Tr. at 167–74, 193–200. The undersigned recognizes that the ALJ supported her credibility determination with the evidence that reinforced her conclusion, but failed to cite the indications in the function reports that may have weakened it. However, the ALJ was not required to accept all of Plaintiff's allegations because she determined they were not entirely credible. The ALJ explained her reasons for not including the contrary information from the function reports by explaining that the degree of disabling impairments Plaintiff alleged were contradicted by evidence of a higher level of functioning in daily activities. *See* Tr. at 17, 18.

Finally, the undersigned concludes that the ALJ adequately considered all factors set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(c) and SSR 96-7p. The ALJ compared Plaintiff's statements about her symptoms to the relevant evidence in the case record to reach a conclusion about her credibility. As discussed above, the ALJ addressed Plaintiff's daily activities and concluded that they indicated Plaintiff could function better

than she alleged. *See* Tr. at 17. The ALJ considered the location, duration, frequency, and intensity of Plaintiff's pain and other symptoms, concluding that the laboratory and other objective evidence showed no findings consistent with severe pain or significant functional limitations; that Plaintiff did not receive treatment consistent with severe pain; that Plaintiff did not complain of severe symptoms that did not respond to medication; and that Plaintiff's statements and the statements of others in the medical records did not support the presence of disabling impairments. *See* Tr. at 17–18. The ALJ considered Plaintiff's allegations that her back pain was exacerbated by standing too long and that she could stand for about 15 minutes and sit for about 45 minutes at a time. *See* Tr. at 15. He also considered Plaintiff's allegations that her depression and anxiety were associated with crying spells, panic attacks, fatigue, decreased energy, and poor memory. *See id.* However, he concluded that these allegations were not supported by the evidence. *See* Tr. at 15–18. The ALJ considered the type, dosage, and effectiveness of Plaintiff's medications as well as her alleged side effects, but concluded that the record indicated her medications generally controlled her symptoms and that her alleged side effects were inconsistent with her daily activities. *See* Tr. at 15–16, 18. The ALJ examined Plaintiff's treatment history, but concluded that she had not obtained routine psychiatric treatment or counseling, participated in pain management or physical therapy, or obtained steroid injections. *See* Tr. at 15–17. In light of all of the foregoing, the undersigned finds that the ALJ's decision clearly indicates the weight she gave to Plaintiff's statements and the reasons for that weight and contains specific reasons for her finding on credibility that are supported by the evidence in the case record.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 20, 2014                          Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge